UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
ASHLAND

Civil Action No. 19-73

IDA MAE CARTY, PLAINTIFF,

v.   **MEMORANDUM OPINION AND ORDER**

HOUCHENS FOOD GROUP, INC., DEFENDANT.

Ida Mae Carty went to Hawaii for two weeks, twice within seven months. Shortly after she returned from her second trip, she was fired. Her employer, Houchens Food Group, Inc. ("Houchens") states she was fired for lying. Carty maintains she was fired because she went to Hawaii. The Court finds that it is for a jury to decide.

**A.**

Carty began working for Houchens in October 2001. [Deposition of Ida Mae Carty, Docket No. 21-2, p. 24]. She was hired as an Assistant Manager for Houchens' Save-A-Lot grocery store in Parkersburg, West Virginia. *Id.* at p. 13. In 2015, she requested, and was given, a transfer to Houchens' Save-A-Lot location in Morehead, Kentucky. *Id.* at p. 15. Along with the transfer, she received a promotion to Store Manager, as well as a raise. *Id.* at p. 17.

Carty's daughter, Maggie, suffers from scoliosis. In 2018, Maggie, then age 13, was scheduled to undergo surgery, related to her condition. *Id.* at p. 55. Carty's supervisor, District Manager Mark Meyers was aware of Maggie's condition and also knew that she was scheduled for surgery. [Deposition of Mark Meyer, Docket No. 22-5, p. 59]. He had received from texts from Carty

1

regarding the surgery, along with photos of Maggie's x-rays. *Id.* at, p. 61. Meyers testified that he knew Carty wanted to take time off to be with her daughter during her recovery. *Id.* at p. 59-60, 63-64].

Myers informed his supervisor, Division Manager Bruce Goodman about Carty's daughter and the upcoming surgery. [Deposition of Bruce Goodman, Docket No. 22-6, p. 40]. Goodman did not initially get involved, claiming that it was Myers' "responsibility to cover that position or - - make sure that the store [was] covered." *Id.* at 41.

Houchens' Leave Policy, as set forth in its Employee Handbook, provides that once an employee notifies her immediate supervisor of her desire for medical leave, the manager has the responsibility to advise the corporate office of the request so that the corporate office could obtain the necessary information/documentation and approve/deny the request for leave. [Employee Handbook, Docket No. 22-7, p. 24 and Leave Policy, Docket No. 22-8, p. 14].

Upon the scheduling of Maggie's surgery, Carty presented Family Medical Leave Act ("FMLA") paperwork from Maggie's doctor's office to Myers so that she could be with Maggie during her surgery and for her recovery. [Carty Depo, Docket No. 21-2, p. 58-59]. Myers denies that Carty requested FMLA leave by name and further denies that she ever presented him with any FMLA paperwork. [Myers Depo., Docket No. 22-5. P. 73]. Carty has not produced a copy of the paperwork.

Maggie underwent surgery on June 7, 2018. [Carty Depo, Docket No. 21-2, p. 141]. A few days later, Carty asked Meyers about the status of her request for leave. *Id*. He told her that he wanted to get another employee his vacation and then he would take care of her leave. *Id.* p. 141-142.

Thereafter, Carty repeatedly asked Myers about the status of her request for medical leave. *Id.* at p.142-143. She testified that he told her "hang in there" assured her that he was working on her request for leave and said that he would work with her in the interim so that Carty could be with her daughter when needed. *Id.*

2

Despite these alleged assurances, Carty claims her request was neither processed nor approved. As a result, she testified she was often "scrambling" to make arrangements for Maggie and it became increasingly difficult to find suitable caregivers. *Id.* at p. 132-134.  A co-worker, Annie Waggoner testified that on several occasions, Carty was forced to bring Maggie to work with her, leaving her in her car in the parking lot for hours. [Deposition of Annie Waggoner, Docket No. 21-4, p. 459].

As for the FMLA paperwork, Carty cannot recall exactly when she submitted such a form.  The only evidence in the record is Leave of Absence Request Form, dated August 1, 2018. [Docket No.21-3].  In the form, Carty wrote that she needed family leave from August 11, 2018 to September 16, 2018 to "care for daughter who had major back surgery and spinal fusion." *Id.*

On August 7, 2018, Carty faxed a Department of Labor FMLA certification form to Houchens' Leave Coordinator, Cody Kessler, repeating that care was needed for her daughter. *Id.*   The next day, Carty called Kessler to ask if she was approved for FMLA leave. *Id.*  Kessler sent her additional  forms, and, on August 9, 2018, she submitted the completed forms to him. (Id. at 6–9). Kessler sent a Notice of Eligibility for FMLA leave to Carty later that day. *Id.*

Carty began her FMLA leave on August 11, 2018, which lasted through September 16, 2018. During this time, Carty, her husband and Maggie travelled to Hawaii and stayed there for twelve days. According to Carty, the trip had been approved by Maggie's doctors and she had informed Meyers of her plans. [Carty Depo., Docket No. 21-2, p. 185]. She testified that she did not conceal her trip from anyone. *Id.* at 182.

Prior to her departure, news of Carty's travel plans reached the upper echelons at Houchens. The Human Resources Director, Courtney Meador, told Carty that "family leave is to take care of family." *Id.* at p. 91. Carty assured Meador that she would be "taking care of [her] daughter." *Id.*

Meyers testified that he thought Carty was abusing FMLA. [Meyers Depo., Docket No. 22-5, p. 85].

3

Goodman called Carty prior to signing off on her request, to remind her of the company policy that 2-week vacations were not permitted for store managers. [Carty Depo., Docket No. 21-2, p. 87]. Carty stated that other managers had been permitted to take "more than a week." *Id.* at p. 169. She also pointed out that there was no rule against travelling while on medical leave and that she would be caring for her daughter while in Hawaii. *Id*. at p. 167-168. She testified that she told Goodman that she needed medical leave to be with her daughter regardless of whether or not they traveled. *Id.* She further testified that she told Goodman that if her medical leave was denied, she wanted to know, in writing, who was denying her leave and why and said that she would be calling "somebody". *Id.*

A few hours later, Goodman called back and Carty that he was going to let her have her "two-week vacation" and told her, "[y]ou win this one." *Id.*at p. 170-171.

While in Maui, staying at the Kā'anapali Beach Hotel, Carty and her family were offered a discounted rate for booking another trip. [Deposition of Richard Carty, Docket No. 21-7, p. 672]. According to her husband, Richard, Carty was interested but was not sure if she could get time off of work. *Id.* Carty contacted a friend and asked if she would be able to take the trip if Carty was unable to leave work. *Id.* The friend agreed, and the Carty's booked a return trip to Maui in February/March of 2019. *Id.*

**B.**

Upon her return from Hawaii in mid-September of 2018, Carty testified that she noticed a difference in the way she was treated at work. [Carty Depo. Docket No. 21-2, p. 282]. Goodman made an unexpected and rare in-person store visit at the Morehead, Kentucky store, during which he was critical of the condition of the store. *Id.* Carty further testified that Myers started monitoring her labor costs on a daily basis as opposed to a weekly basis. *Id.* She claimed that Management was watching her labor costs so closely that there were times she had to work by herself , as the only salaried

4

employee , without the ability to take a lunch break or restroom break. *Id.* at p. 283. She recalled that on one occasion, Myers confronted her because she had to leave 15 minutes early to get home to Maggie. *Id*. at p. 284-285. According to Carty, this had never been a problem before her trip, as Meyer had always allowed to make up time on a subsequent shift. *Id.* at p. 285. She was also required to start working hours on Sundays, though she had always had the freedom to make her own schedule before. *Id.* Carty testified that Myers told her that the changes were because Goodman was "pissed" at her. *Id.* at p. 288.

## C.

In December 2018, Carty told Meyers about the stress she had been under since her return from medical leave and informed him that she was planning to return to her "happy place" (i.e. Hawaii) in February. *Id.* at p. 220-22. According to a co-worker, Jessica Riddle, Myers responded that he felt bad about the problems surrounding her medical leave and told her that she could take two weeks off if she wanted. [Deposition of Jessica Riddle, Docket No. 21-5, p. 529-530]. Meyers denies this conversation.

On December 20, 2018, based on her alleged conversation Meyers, Carty booked her flight to Hawaii with a departure date of February 18, 2019 and a return date of March 4, 2019.

On February 1, 2019, Carty completed a "Leave of Absence Request Form" requesting "Personal Leave" and citing "family issues" as the reason for her request for leave for the time period from February 16, 2019 - March 5, 2019. [Docket No. 22-11].

A week later, Kessler phoned Carty about her request. Carty told Kessler that "her cousins were ill", then she told him that "her husband was having surgery." [Kessler Depo., Docket No. 22-12, p. 36]. Kessler told her that, in order to obtain FMLA leave, she needed to submit the FMLA certification forms. *Id.* Kessler explained to her that "[FMLA leave] is protected leave, while personal isn't protected." [Carty Depo., Docket No. 21-2]. Carty told him "[i]t doesn't matter. I need

5

this time off. I don't care. It doesn't matter. I need this time off." *Id.* at 20–22.

Defendant points out that copy of the February 2019 Leave of Absence Request Form appears to depict a check mark made next to "Family Leave" which has been whited out and subsequently checked "Personal Leave." Carty was unable to explain this apparent edit and has failed to produce the original for inspection, despite repeated requests.

Houchens company policy allows for a *Personal Leave of Absence* "in cases in which Houchens determines that an extended period of time away from the job will be in the best interests of the employee and Houchens." [Docket No. 22-7, p. 24]. Requests for an extended leave are submitted to the employee's supervisor and then forwarded to the "Personnel Department" and the "final decision concerning the request for a leave of absence will be made by the Personnel Department," not the District or Division Manager *Id.*

Myers signed Carty's request for personal leave. [Docket No. 21-11]. However, he denies having any knowledge of Carty's travel plans, claiming that he believed that she was requesting a "family leave" to care for her husband who was having hernia surgery and because "her daughter had something going on." [Myers Depo., Docket No. 21-5, p. 95-99].

Carty left for Hawaii on February 18, 2019 and stayed there until March 4, 2019. During her trip, she posted some photographs on social media. Goodman testified that it was only by seeing these photos that he learned that Carty was in Hawaii. [Goodman Depo., Docket No. 22-6, p. 65]. He subsequently learned that she was on a preapproved personal leave. *Id.* According to Goodman, Myers denied having any knowledge that Carty was in Hawaii, but he believed that she was on a "family leave" to care for her husband. *Id.* at 64.

On March 5, 2019 and immediately upon Ms. Carty's return from her leave, she was met at the store by Myers and Regional Manager, David Jones and told that she

6

needed to complete FMLA paperwork for her leave. [Deposition of David Jones, Docket No. 22-10, p. 20]. She refused, stating that she was on an approved "personal leave" and that it was not "medical leave". *Id.* She told Jones that it would be dishonest for her to submit paperwork for "medical leave" when she was on a "personal leave". *Id.* at p. 23. Carty was sent home and told that she would not be able to return to work unless she had the FMLA paperwork completed. *Id*. at p. 25.

On March 13, 2019, Kessler called Carty and attempted to persuade her to complete the FMLA paperwork. Again, she refused to complete what she believed would have been dishonest FMLA paperwork. Kessler does not recall this conversation. [Kessler Depo., Docket No. 22-12, p. 50].

On March 18, 2019, she was terminated. The Separation Notice, signed by Meyers, states that she was fired for being "untruthful concerning personal leave". [Docket No. 22-4].

**D.**

Carty filed a charge of discrimination with the EEOC indicating she had been discriminated against because of her gender and age. [Carty Depo, Docket No. 21-2, p. 143-144:12]. The EEOC Charge was withdrawn.

This lawsuit followed, wherein Carty claims FMLA interference as well as retaliation. [Complaint, Docket No. 1].

Carty returned to Hawaii in March 2020 for three weeks. [Richard Carty Depo, Docket No. 21-7, p. 50].

Defendant seeks summary judgment as to all claims alleged herein.

**II.**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The burden to show that there are no genuine issues of material fact falls on the party seeking summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317,

7

322–23(1986). This Court will consider the evidence in the light most favorable to the non-moving parties, drawing all justifiable inferences in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law. *Id*. at 251–52. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.] *Id*. at 255.

### III.

The FMLA entitles eligible employees who suffer from "a serious health condition that makes the employee unable to perform the functions of the position" to take up to 12 weeks of qualifying leave per year. 29 U.S.C. § 2612(a)(1)(d). Qualifying employees who return to work within the 12-week leave period are entitled to be returned to their previous position or to an equivalent position with the same pay, benefits, and other terms of employment. *Edgar v. JAC Prod., Inc.*, 443 F.3d 502, 506 (6th Cir. 2006) (*citing* 29 U.S.C. § 2614(a)(1) ). "Once the 12-week period ends, however, employees who remain 'unable to perform an essential function of the position because of a physical or mental condition ... have no right to restoration to another position under the FMLA.' " *Edgar*, 443 F.3d at 506 (*quoting* 29 C.F.R. § 825.214(b) ).

There are two theories of recovery under the FMLA: (1) interference with an employee's exercise or attempt to exercise any right provided under the FMLA and (2) retaliation against an employee for exercising her rights under the FMLA by discharge or any other manner of discrimination. *Gages v. U.S. Postal Serv.*, 502 F. App'x, 488–89 (6th Cir. 2012). Plaintiff asserts claims under both theories.

8

**A.**

Plaintiff alleges that Houchens interfered with her FMLA rights. Specifically, Carty alleges that she notified Houchens of her need for FMLA leave in June 2018 and submitted paperwork to that effect, but that Houchens refused to accept the paperwork and attempted to prevent Carty from taking FMLA leave, constituting interference.

It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1). To establish a *prima facie* case of FMLA interference, a plaintiff must show that: "(1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled." *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012) (*citing Killian v. Yoruzu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) ).

Defendant contends that Carty did not give proper notice of her intent to take leave until August 2018. It maintains that it is "undisputed" that no paperwork was submitted in June and, therefore, Plaintiff's claim fails at the fourth prong of the inquiry.

"To invoke the FMLA's protection ... the eligible employee, during his employment, must request leave and give the employer notice that he is requesting leave for a serious health condition that renders him unable to perform his position's duties." *Brenneman v. MedCentral Health Sys.,* 366 F.3d 412, 421 (6th Cir.2004). However, an employee "does not have to expressly assert [a] right to take leave as a right under the FMLA." *Cavin v. Honda of Am. Mfg., Inc.,* 346 F.3d 713, 726 (6th Cir.2003). Indeed, an employee need not mention FMLA at all. *See* 29 C.F.R. § 825.303(b). All that is required is that the employee provide sufficient information to apprise the employer of his request to

take time off for a serious health condition. *See Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

Once the employee communicates that leave is needed, "[t]he burden then shifts to the employer to determine whether leave was sought under the Act and to obtain any additional information." *Sahadi v. Per[-]Se Technologies, Inc.,* 280 F.Supp.2d 289, 298 (E.D.Mich.2003). If the employer lacks sufficient information about the employee's reasons for taking leave, the employer has the duty to inquire further to ascertain whether the leave is potentially FMLA-qualifying.

This is an intensely factual determination, with a number of regulations governing how employees and employers must act based on the nature of the notice, the nature of the reason for leave, and the exigency of the leave request. *See generally* 29 C.F.R. § 825.302

Here, there is sufficient evidence of proper notice that Defendant is not entitled to summary judgment on this basis. Contrary to Defendant's assertion, it is very much in dispute if and when Carty submitted her FMLA certification. As Plaintiff points out, Houchens ignores the possibility that Myers took possession of the paperwork, but did not submit it to the corporate office and that Carty did not keep a copy of the paperwork because she trusted him to do what company policy required of him. Or, as Defendant posits, the forms may have simply "vanished into thin air." It is not for this Court to determine the outcome of this he said-she said. Rather, this factual dispute involves issues of credibility and weighing of the evidence and belongs to a jury.

Defendant also maintains that because Plaintiff received FMLA leave, her claim fails. Houchens claims that she submitted the paperwork in August and was granted leave forthwith. It suggests a "no harm, no foul" approach to her interference claim.

Yet, the situation presented by the facts before the Court is not one in which a plaintiff ultimately obtained the leave requested and, thus, suffered no injury. *See e.g.*, *Seeger v. Cincinnati Bell Tel. Co., LLC,* 681 F.3d 274, 283 (6th Cir. 2012). Houchens ignores Carty's side of the story. She

10

claims that her medical leave was delayed by two months because Myers failed or refused to forward her initial FMLA paperwork to the corporate office or otherwise inform the corporate office of her request for medical leave. Again, the material facts are in dispute, thereby precluding summary judgment as to Plaintiff's claim of FMLA interference.

## B.

Plaintiff also asserts a cause of action for FMLA retaliation. Specifically, she claims that she was antagonized, and ultimately fired, because she took FMLA leave.

The FMLA provides that it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). Likewise, "employers cannot use the taking of FMLA leave as a negative factor in employment actions". 29 C.F.R. § 825.220(c).

A *prima facie* case for FMLA retaliation requires a plaintiff to show the following: "(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of her FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Donald v. Sybra, Inc.,* 667 F.3d 757, 761 (6th Cir. 2012).

In the absence of direct evidence and where the prima facie case is established, an FMLA retaliation claim is then evaluated under the *McDonnell Douglas* burden shifting paradigm. *Seeger,* 681 F.3d at 284. One a prima facie case has been established, if the defendant has articulated a legitimate, nondiscriminatory reason for terminating the plaintiff's employment, the burden of establishing pretext shifts to plaintiff. *Id.* This requires plaintiff to demonstrate the reason for her termination "(1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action." *Id.* at 285.

There is sufficient evidence of antagonistic behavior toward Ms. Carty following her request for and use of medical leave to support a finding that her exercise of FMLA rights was a motivating factor in the decision to terminate her employment. Both Myers and Goodman initially opposed her medical leave. Meyers suggested Carty was abusing medical leave to get approval for an extended Hawaiian "vacation". Goodman ultimately withdrew his opposition to Ms. Carty's medical leave only after she threatened to "call someone", saying, "[y]ou win this one". Clearly, Carty's supervisors were not pleased.

In addition, Carty testified that within days of her return Goodman made a rare trip from his office in West Virginia for an in-store visit to the Morehead store, where he reprimanded her for the condition of the store. Also, she was subjected to increased scrutiny about her labor hours and she forced to work Sundays, with Myers telling her that the changes were because Mr. Goodman was "pissed" at her. A jury may not believe her. Then again, they might.

Houchens' reason for firing Carty is also not immune to question. Goodman states Carty lied about her second trip. Carty claims she did not conceal either trip and, further, discussed her plans with Meyers. The material facts surrounding her termination are in dispute. As such, summary judgment is not warranted.

### IV.

Issues of fact and credibility abound in this case. Where the ascertainment of the facts of a case turns on the credibility of witnesses, a triable issue of fact exists, and the granting of a summary judgment is improper. Resolving conflicts and ambiguities in a witness's testimony is not a function of the Court to be performed through the medium of summary judgments.

Accordingly, **IT IS HEREBY ORDERED** that Defendant Houchens Food Group, Inc.'s Motion for Summary Judgment [Docket No. 21] be **OVERRULED**.

This 8th day of February, 2021.



**Signed By:**
*Henry R Wilhoit Jr.*
**United States District Judge**

12